1
2
3
4
5
6

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Matthew M. Loker, Esq. (279939)
ml@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (225557)
josh@westcoastlitigation.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile: (619) 297-1022

7
8
9
10
11

**LAW OFFICE OF CLARK OVRUCHESKY**
Clark Ovruchesky (301844)
co@colawcalifornia.com
750 B. Street, Suite 3300
San Diego, California 92101
Telephone: (619) 356-8960
Facsimile: (619) 330-7610

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

12
13

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

14
15
16

**KELLIE GADOMSKI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**

17

Plaintiff,

18

v.

19
20

**I.C. SYSTEM, INC.,**

Defendant.

Case No.:

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**

21
22
23

1.) **THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692, ET SEQ.;**

2.) **THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, CAL. CIV. CODE § 1788, ET SEQ.; AND**

24
25
26
27

3.) **CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT, CAL. CIV. CODE § 1785.1, ET SEQ.**

28

**JURY TRIAL DEMANDED**

**INTRODUCTION**

1. The United States Congress has found abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors, and has determined that abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy. Congress wrote the Fair Debt Collection Practices Act, ("FDCPA") 15 U.S.C. § 1692 et seq., to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent state action to protect consumers against debt collection abuses.

2. The California legislature has determined that the banking and credit system and grantors of credit to consumers are dependent upon the collection of just and owing debts and that unfair or deceptive collection practices undermine the public confidence that is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers. The Legislature has further determined that there is a need to ensure that debt collectors exercise this responsibility with fairness, honesty and due regard for the debtor's rights and that debt collectors must be prohibited from engaging in unfair or deceptive acts or practices.

3. In addition, the United States Congress has also found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. As such, Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") to insure fair and accurate reporting, promote efficiency in the banking system and protect consumer privacy. The FCRA seeks to ensure consumer reporting agencies

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.   The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

4.   There exists today in the United States a pervasive and fundamental misunderstanding about the long-term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

5.   The *majority* of consumer debtors who actually file consumer bankruptcy do so to ***raise*** their credit score and remedy their poor credit worthiness.

6.   It is entirely possible for consumer debtors to have over a 700 FICO Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7.   Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys a consumer's credit worthiness for ten years.

8.   In an effort to perpetuate the aforementioned bankruptcy myth, creditors intentionally and routinely ignore credit reporting industry standards for accurately reporting bankruptcies and debts included in those bankruptcies in an effort to keep consumers' credit scores low and their interest rates high.

9.   Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

10. Plaintiff **KELLIE GADOMSKI** ("Plaintiff"), through her attorneys, brings this lawsuit to challenge the actions of Defendant **I.C. SYSTEM, INC. ("ICS" or "Defendant")**, with regard to Defendant's unlawful debt collection practices and reporting of erroneous negative and derogatory reports to Plaintiff's credit report, as that term is defined by 15 U.S.C. § 1681a(g), which Defendant knew or should have known was erroneous and which caused Plaintiff damages.

11. Plaintiff makes these allegations on information and belief, with the exception of allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

12. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

13. Unless otherwise stated, Plaintiff alleges that any violations by Defendant were knowing and intentional, and that Defendant did not maintain procedures reasonably adapted to avoid any such violation.

14. Unless otherwise indicated, the use of Defendant in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant.

15. Unless otherwise stated, all the conduct engaged in by Defendant occurred in California.

### JURISDICTION AND VENUE

16. Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692(k). In addition, jurisdiction also arises pursuant to 28 U.S.C. § 1367 for supplemental State claims.

///

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

17. This action arises out of Defendant's violations of (i) the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. ("FDCPA"); (ii) the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq*. ("RFDCPA"); and, (iii) the California Consumer Credit Reporting Agencies Act. Cal. Civ. Code § 1785, *et seq*. ("CCCRAA").

18. The Court has personal jurisdiction over Defendant as Defendant conducts business within the State of California and has purposefully availed themselves of the laws and markets of the State of California and this district.

19. Venue is proper in the United States District Court, Eastern District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in the County of San Joaquin, State of California, which is within this judicial district; (ii) the conduct complained of herein occurred within this judicial district; and, (iii) Defendant conducted business within this judicial district at all times relevant.

## PARTIES

20. Plaintiff is a natural person who resides in the City of Tracy, County of San Joaquin, in the State of California.  In addition, Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3); Cal. Civ. Code § 1785.3(c); and, 15 U.S.C. § 1681a(c). Plaintiff is also a natural person from whom a debt collector sought to collect a consumer debt which was due and owing or alleged to be due and owing from Plaintiff, and is a "debtor" as that term is defined by Cal. Civ. Code § 1788.2(h). In addition, Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

21. Defendant ICS is a Minnesota corporation and authorized to do business in the State of California.

///

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

22. Defendant is a furnisher of information as contemplated by FCRA sections 1681s-2(a) & (b), which regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer.

23. Defendant, in the ordinary course of business, regularly, on behalf of themselves and others, engages in "debt collection" as that term is defined by Cal. Civ. Code § 1788.2(b), and are each therefore a "debt collector" as that term is defined by Cal. Civ. Code § 1788.2(c) and 15 U.S.C. § 1692a(6). Such debt collection is conducted upon debts or alleged debts that are in default at the time they were acquired and/or assigned to Defendant.

24. Defendant is a partnership, corporation, association, or other entity, and is therefore a "person" as that term is defined by Cal. Civ. Code § 1785.3(j).

25. This case involves money, property, or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction. As such, this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by Cal. Civ. Code § 1788.2(f) and a "debt" as the term is defined by 15 U.S.C. § 1692a(5).

26. Trans Union, LLC ("TransUnion"), Equifax Information Services LLC ("Equifax"), and Experian Information Solutions, Inc. ("Experian") are each a "consumer reporting agency" ("CRAs") as that term is defined by 15 U.S.C. § 1681a(f).

27. The causes of action herein also pertain to Plaintiff's "consumer credit report" as that term is defined by Cal. Civ. Code § 1785.3(d), in that inaccurate representations of Plaintiff's credit worthiness, credit standing, and credit capacity were made via written, oral, or other communication of information by a consumer credit reporting agency, which is used or is expected to be used, or collected in whole or in part, for the purposes of serving as a factor in establishing Plaintiff's eligibility for, among other things, credit to be used

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

1   primarily for personal, family, household and employment purposes.

2   **GENERAL CREDIT REPORTING INDUSTRY ALLEGATIONS**

3       **a. FICO**

4   28.   FICO Inc. ("FICO") is a leading analytics software company with its principal

5   headquarters located in San Jose California. FICO has over 130 patents related

6   to their analytics and decision management technology, and regularly uses

7   mathematical algorithms to predict consumer behavior including credit risk.

8   29.   The FICO Score has become the standard measure of consumer credit risk in

9   the United States and is used in ninety percent of lending decisions.

10  30.   A FICO score consists of a three-digit number summarizing a consumer's

11  credit risk or likelihood to repay a loan. FICO periodically updates its scoring

12  models resulting in multiple FICO Score versions.

13  31.   Base FICO Scores range from 300 to 850, while industry-specific FICO

14  Scores range from 250-900. A higher FICO Score demonstrates lower credit

15  risk or less likelihood of default.

16  32.   Different lenders use different versions of FICO Scores when evaluating a

17  consumer's credit worthiness.

18  33.   There are 28 FICO Scores that are commonly used by lenders.

19  34.   A consumer's FICO Score is calculated based solely on information in

20  consumer credit reports maintained at CRAs.

21  35.   The three largest CRAs are Equifax, Experian, and TransUnion.

22  36.   FICO does not control what information is provided on a consumer's credit

23  report. Instead, the scoring models or algorithms are based on the premise that

24  information provided by the CRAs is accurate and complies with credit

25  reporting industry standards.

26  37.   There are five key factors that a FICO Score considers: 1) Payment history; 2)

27  Amount of Debt; 3) Length of Credit History; 4) New Credit; and 5) Credit

28  Mix.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

38. Each of the five factors is weighted differently by FICO.

39. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

40. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

41. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

42. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

43. FICO Scores are entirely dependent upon information provided by Data Furnishers ("DFs") to CRAs.

44. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both "Chapters" have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

   b.  **Metro 2**

45. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

46.   The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

47.   The Consumer Data Industry Association's ("CDIA") Metro 2 format is *the* credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[1]

48.   Therefore, the credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

49.   The CDIA is *the* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a.   The CDIA offers an FCRA certificate program for all CRAs

    b.   The CDIA offers an FCRA awareness program for all CRAs.

    c.   The CDIA offers an FCRA certificate program for DFs.

    d.   The CDIA offers an FCRA awareness program for DFs.

    e.   The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

    f.   The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

    g.   The CDIA developed a credit reporting resource guide for accurately reporting credit.

---

[1] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at:
http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

50. The CDIA's Metro 2 is accepted by all CRAs.

51. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's Credit Reporting Resource Guide ("CRRG").

52. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

53. The CRRG is not readily available to the public. It can be purchased online for approximately $229.45.

54. Even if a buyer is ready and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

55. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

56. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

57. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk, resulting in less favorable lending terms.

58. E-OSCAR is the web based Metro 2 compliant system developed by the CRAs that enables DFs and CRAs to create and respond to consumer credit disputes.

59. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-Oscar to the DF.

60. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file, e.g. "Account Type - 07" (07 in Metro 2 refers to a Charge Account).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

61. When a consumer files bankruptcy, certain credit reporting industry standards exist.

62. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

63. The Consumer Information Indicator ("CII") is a critical *status* field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

64. Under Metro 2, the CII must be reported only on the consumer to whom the information applies.

65. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

66. In the consumer bankruptcy context, CII Metro Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

67. Such a reporting alert any potential lender that the account is no longer in a collectable status, but is rather being handled by a Chapter 7 trustee.

68. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

69. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

70. The lack of a CII reported status makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

71. The lack of an accurate reporting of the CII field also suggests that creditors are free to collect against a consumer per their pre-bankruptcy contract terms, which is inaccurate and materially misleading due to the effect of the bankruptcy orders, such as the automatic stay of section 362 of Title 11, that exist to prevent post-petition collection activity and the discharge order which enjoins post-discharge collection upon any *in personam* liability for a claim.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

72. Therefore, failure to report the correct CII status indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

73. Under the FCRA, a bankruptcy can be reported for ten years.

74. The ten-year rule for reporting runs from the date the bankruptcy was *filed*.

75. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

76. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

77. Failure to reference the bankruptcy filing and/or discharge in the CII field and/or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

78. As explained in more detail below, Defendant failed to reference the bankruptcy filing and discharge in the CII field in Plaintiff's Equifax Credit Report in respect to multiple consumer credit accounts successfully discharged through Plaintiff's Chapter 7 Bankruptcy.

79. Instead, Defendant reported that the *current* (pay) status of the debts were "Charged Off", i.e. still legally collectable, or otherwise still legally owed with an outstanding balance owing as opposed to "Discharged in Bankruptcy" with a $0 balance.

80. The failure to report the correct status of "Discharged in Bankruptcy" with a $0 balance owed inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay the alleged Debt, which is the opposite effect of receiving a Chapter 7 bankruptcy discharge.

///

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

## GENERAL CLASS ACTION ALLEGATIONS

81.  Plaintiff is among many thousands of persons in the United States who have filed bankruptcies pursuant to Chapters 7 and 13 of the U.S. Bankruptcy Code and who have been granted orders of discharge by a U.S. Bankruptcy Court. Under federal bankruptcy laws, such an order fully and completely discharges all statutorily dischargeable debts incurred prior to the filing of bankruptcies, except for those that have been: (1) reaffirmed by the debtor in a reaffirmation agreement; or (2) successfully challenged as non-dischargeable by one of the creditors in a related adversary proceeding. Plaintiff and the Class Members are persons for whom the debts at issue have been discharged through bankruptcy.

82.  Defendant is a debt collector regularly engaged in the business of collecting consumer debts from consumers.

83.  In the ordinary course of business, Defendant's debtors who are enduring financial hardship fall behind on their payments of Defendant's credit accounts. Prior to the filing of any personal bankruptcies, Defendant, as a collection agency, acts to collect these past due debts by threatening in dunning letters to place a "charge off" or other similar "past due" notations on the debtors' credit reports. Said letters threaten to ruin the debtors' credit unless they pay the past due debt. Defendant also acts to collect these past due debts by promising in dunning letters to remove the "charge off" or other "past due" notations on the debtors' credit reports to show that the past due debts have been paid if the debts are paid.

84.  In the ordinary course of business, Defendant issues reports to credit reporting agencies as to the current status of debts incurred by individuals whom Defendant is seeking to collect from. It is also an entity which regularly and, in the ordinary course of business, furnishes information to one of more credit reporting agencies about its transactions and experiences with consumers.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

85. Defendant has knowledge of when its past due debts are discharged because it receives a discharge notice from the U.S. Bankruptcy Court.

86. Despite the fact that Defendant has received notice of the discharge of each Class Member's debt to Defendant, Defendant has a deliberate policy of not notifying credit reporting agencies that debts formerly owing to Defendant are no longer "charged off" or currently still due and owing because they have been discharged in bankruptcy. As a result of Defendant's refusal to make such updates to credit reporting agencies, debts that have been discharged in bankruptcy are instead listed on Class Members' credit reports as "past due" and/or "charged off." These notations clearly indicate to potential creditors, employers, or other third parties that a Class Member still owes a debt and that debt may be subject to collection. These notations therefore adversely affect a Class Member's ability to obtain credit or employment and have the inherent coercive effect of inducing Class Members to make payment on the debt.

87. Moreover, Defendant's failure and further refusal to update credit report tradelines for many thousands of consumers to reflect that their debts were, in fact, discharged in Bankruptcy, as opposed to reporting a *current* (pay) status of "charged off" or "past due", runs afoul to Section 727 of the Bankruptcy Code and *the* primary purpose of the protection offered by the Bankruptcy Code—the discharge of a debt. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

88. Upon information and belief, Defendant has a deliberate policy of refusing the debtors' requests to remove "charged off" and other similar "past due" *current* (pay) statuses from the Defendant's debts that were transferred/sold prior to the filing of the bankruptcy from the debtors' credit reports. As a result, the credit reports of these individuals and of all Class Members incorrectly show their indebtedness to Defendant to be legally collectible.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

89. Defendant knew that the existence of such inaccurate information in the Class Members' credit reports would damage the Class Members' credit ratings and their ability to obtain new credit, a lease, a mortgage or employment, all of which may be essential to reestablishing their life after going through bankruptcy.

90. Defendant has chosen not to advise the CRAs of the fact that the Class Members' debts have been discharged because Defendant continues to receive payment either directly or indirectly on discharged debts. This results from the fact that Class Members, in order to obtain favorable credit or credit at all, often feel it necessary to pay off the debt despite its discharge in order to remove the inaccurate information from their credit reports.

91. Class Members often believe that they must pay the debt in order to remove it from the credit reports because they are often advised prior to bankruptcy by Defendant that, if their debt is marked as unpaid or charged off, it will dramatically affect their credit rating and will severely impact their ability to receive credit in the future.

92. Defendant has adopted a systematic pattern and practice of failing and refusing to update credit information with regard to debts discharged in bankruptcy. Defendant knows that if the credit information is not updated, then many Class Members will feel compelled to pay off the debt even though it is discharged in bankruptcy. Thus, Defendant knows they will be able to collect portions of Defendant's debt despite the discharge of that debt in bankruptcy through the power of inaccurate and misleading credit reporting.

93. Defendant therefore has a clear economic incentive to violate the FDCPA, RFDCPA, and CCCRAA.

94. Reporting a debt to a credit bureau is a "powerful tool designed, in part, to wrench compliance with payment terms." *Rivera v. Bank One*, 145 F.R.D. 614, 620 (1993).

95. Defendant's conduct is in bad faith, is vexatious and oppressive and is done with full knowledge that it is in violation of the law.

96. As a result of a major class action settlement, the CRAs have agreed to revise their procedures to report all pre-bankruptcy debts as discharged, unless furnishers provide information showing that a debt was excludable from discharge. *White v. Experian Info Solutions, Inc.*, Case No. CV 05-01070 (C.D. Cal. Aug. 19, 2008) (lead case number).

97. Therefore, even the CRAs have acknowledged that the accurate and proper way to report the status of all pre-bankruptcy debts, like Plaintiff's and Class Members' debts, following successful Bankruptcy discharges of the debt, is "Discharged in Bankruptcy" (or the equivalent).

98. Despite this reform, there continue to be problems with improper reporting of discharged debts, including allegations that creditors have deliberately engaged in the practice to in order to pressure debtors to pay off discharged debts, and even refusals to correct the reporting after being requested to do so by the debtor.[2]

99. Over the past several years, thousands of consumers have had successful bankruptcy discharges, but Defendant has failed to update their credit trade lines to reflect that fact and continued to falsely report those debts as due and owing, despite the fact that the bankruptcy court records show that the debts at issue had been discharged.

---

[2] *See, e.g.*, *Belton v. GE Capital Consumer Lending* (*In re Belton*), 2014 WL 5819586 (Bankr. S.D.N.Y. Nov. 10, 2014). *See also* Jessica Silver Greenberg, Debts Canceled by Bankruptcy Still Mar Consumer Credit Scores, N.Y. Times, Nov. 12, 2014. *Keil v. Equifax Info. Serv.*, 2014 WL 4477610 (N.D. Cal. Sept. 10, 2014) (in response to debtor's dispute, credit union stated its policy was to report all charged-off debts as unpaid, irrespective of bankruptcy discharge); *In re Haynes*, 2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) (debtor alleged that creditor refused his request to remove charge-off notation from account discharged in bankruptcy).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT DI
COSTA MESA, CA 92626

100. Defendant's persistent refusal to provide updated credit information to the credit reporting agencies that Class Members' past due debts are no longer "charged off" or "unpaid" with outstanding balances because they have been discharged in bankruptcy is knowing and willful and constitutes violations of the FDCPA, RFDCPA, and CCCRAA.

101. As a direct consequence of Defendant's grossly inadequate and inaccurate reporting practices and procedures, Plaintiff and the Class have been effectively denied the fresh start to which they are legally entitled under the U.S. Bankruptcy Code.

102. In each case described above, Plaintiff and the Class members' legally protected interests in being able to apply for credit based on accurate information have been violated, placing them at an increased risk of not being able to obtain valuable credit and in many cases adversely affecting their credit ratings. WFBNA's publication of false and potentially damaging credit information concerning the Plaintiff and the Class violates their statutorily mandated rights and has caused them particularized and concrete harm.

### GENERAL BANKRUPTCY ALLEGATIONS

103. At all times relevant to this matter, Plaintiff was an individual residing within the State of California.

104. Furthermore, Defendant conducted business within the State of California at all times relevant.

105. Sometime prior to April 23, 2013, Plaintiff is alleged to have incurred certain financial obligations to the original creditor.

106. Sometime thereafter, Plaintiff allegedly fell behind in the payments allegedly owed on the alleged debt.  Plaintiff currently takes no position as to the validity of this alleged debt as it is irrelevant to this action.

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

---

107. Following this delinquency, the original creditor alleged transferred Plaintiff's debt to Defendant for collection.

108. As a result, Plaintiff has received numerous written and telephonic communications from Defendant with regard to Plaintiff's alleged debt.  Said contacts constitute "communications" as that term is defined by 15 U.S.C. § 1692a(2) and "debt collection" as that phrase is defined by 15 U.S.C. § 1692a(6).

109. On or about April 23, 2013, Plaintiff filed for a no asset Chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of California in Fresno. Plaintiff's case was assigned Case Number 13-bk-25655 (the "Bankruptcy").[3]

110. The obligations ("Debt") to Defendant was scheduled and included in the Bankruptcy.

111. Defendant received notice of the Bankruptcy filing on or about April 23, 2013 through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center.

112. On or about August 12, 2013, Plaintiff received a successful bankruptcy discharge.

113. Defendant received notice of the Bankruptcy discharge on or about August 12, 2013 through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center.

114. Defendant did not file any successful proceedings to declare their Debt "non dischargeable" pursuant to 11 U.S.C. § 523 *et seq*.

115. Defendant also did not request or receive relief from the "automatic stay" codified at 11 U.S.C. §362 *et seq*. while the Plaintiff's Bankruptcy was pending to pursue the Plaintiff for any of the underlying Debts in their pre-

---

[3] The District Court has discretion to take judicial notice of the documents electronically filed in the bankruptcy case.  *See, Atwood v. Chase Manahttan Mortg. Co.* (*In re Atwood*), 293 B.R. 227, 233 n.9 (B.A.P. 9th Cir.2003).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

bankruptcy form.

116. Accordingly, the Debt to Defendant was discharged through the Bankruptcy.

117. Further, while the automatic stay was in effect during the Bankruptcy, it was illegal and inaccurate for Defendant to report any post-Bankruptcy derogatory collection information, which was inconsistent with the Bankruptcy Orders entered by the Bankruptcy Court, including the initial Petition for Relief for Bankruptcy protection, the automatic stay, and the Discharge Order (collectively the "Bankruptcy Orders).

118. Reporting credit information to a CRA is a collection activity.

119. Defendant either reported or caused to be reported inaccurate information after the Bankruptcy was filed *and* discharged, in the form of reporting the *current* account (pay) status of the Debt as being "charged off" or otherwise past due/unpaid as opposed to "Discharged in Bankruptcy" (or the equivalent).

120. The derogatory information reported by Defendant after the Bankruptcy was discharged indicates to potential creditors that the Debt was somehow not discharged in the Bankruptcy and Plaintiff was being actively delinquent in respect to Defendant's Debt, which is inaccurate and materially misleading reporting.

121. Defendant's attempt to collect upon their respective Debt by reporting post-Bankruptcy derogatory information on Plaintiff's Credit Reports, which is a collection activity, was therefore inaccurate and prohibited by the Bankruptcy discharge.

122. Defendant's reporting of post-Bankruptcy derogatory information was also inaccurate because a default on an account included in a bankruptcy can occur no later than the bankruptcy filing date, at which point the accounts included in the Bankruptcy were no longer collectable due to the effect of the automatic stay and ultimate discharge.

123. Thus, by reporting post-Bankruptcy derogatory information, Defendant effectively reported: (1) Plaintiff was being financially irresponsible by failing to pay the debt *after* the Bankruptcy was discharged; and (2) that Plaintiff's Debt was more recently subject to collection than it really was, which is inaccurate and misleading under the FDCPA and CCCRAA.

124. Defendant's attempt to collect upon the Debt by reporting post-Bankruptcy derogatory information on Plaintiff's Credit Reports, which is a collection activity, was therefore inaccurate and materially misleading.

125. Defendant's reporting of post-Bankruptcy derogatory information was also inaccurate and materially misleading because Defendant continued reporting information based on Defendant's pre-bankruptcy contract terms with the Plaintiff, which were no longer enforceable upon the filing of the Bankruptcy and ultimate successful discharge, thereby rendering the disputed information inaccurate and materially misleading.

126. For decades, courts have recognized that when a bankruptcy discharge is granted, the order relates back to the date of filing the petition and relieves the debtor from personal liability as of this date.

127. This is because when a debtor voluntarily files for bankruptcy, the petition constitutes an "order for relief" under the particular chapter the debtor wishes to proceed per Bankruptcy Code 11 U.S.C. § 301(a)-(b).

128. When a debtor such as Plaintiff files a chapter 7 petition, Section 727(b) of the Bankruptcy Code provides that the discharge, when entered, applies to "all debts that arose *before the date of the order for relief*." In other words, the discharge relieves the debtor of personal liability for all prepetition debts.

///

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

129. Thus, in relation to the FDCPA, RFDCPA, and CCCRAA, the discharge order rendered the information reported by Defendant following the bankruptcy discharge inaccurate and patently misleading because the discharge order relieved Plaintiff from any personal obligation to pay Defendant as of the date of filing the Bankruptcy petition—April 24, 2013.

130. Essentially, furnishers of information, like Defendant, are precluded from reporting account balances and delinquency notes on a consumer's credit report anytime after a bankruptcy is filed, due to the effect of the automatic stay and discharge order.

131. Moreover, the derogatory, delinquent post-Bankruptcy information furnished by Defendant was inaccurate and misleading because end users, including potential creditors, may interpret the reported information to mean that Plaintiff incurred new debt during the Bankruptcy or that Plaintiff reaffirmed the debt notwithstanding the discharge.

132. Further, as previously alleged, the Consumer Data Industry Association's ("CDIA") Metro 2 format is the credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[4]

133. Upon information and belief, Plaintiff alleges that Defendant voluntarily chose to subscribe to the Metro 2 format in their credit reporting practices to credit reporting agencies.

134. The CDIA Metro 2 format instructs credit furnishers, including Defendant, to report the following way for consumers, like Plaintiff, after the Chapter 7 Bankruptcy has been filed: (1) report the value indicator "D" or "no data" in the payment history section during a bankruptcy, rather than delinquencies or obligations owing; (2) report the CII status of the account as "Petition for

---

[4] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at:
http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

Chapter 7 Bankruptcy", rather than the account status as it *would have* existed in the months following the filing of the Bankruptcy Petition if the Bankruptcy Petition had not been filed (e.g. "120+ days delinquent" or "charged off").

135. Further, the CDIA Metro 2 format instructs credit furnishers, including Defendant, to report the following way for consumers like Plaintiff who received Chapter 7 bankruptcy discharges: (1) report the value indicator "D" or "no data" in the payment history section, rather than delinquencies or obligations owing; (2) report the CII status of the account as "Discharged through BK Chapter 7", rather than the account status as it *would have* existed in the months following the filing of the Bankruptcy Petition if the Bankruptcy Petition had not been filed (e.g. "120+ days delinquent" or "charged off").; and (3) "Note: After reporting the account with a Discharged CII, discontinue reporting the account."

136. Upon information and belief, Defendant has adopted the *Metro 2 Format Manual* as its standard instruction book in respect to credit reporting.

137. Reasonable entities, including potential creditors, would have thus expected Defendant to report in compliance with the Metro 2 format.

138. Potential creditors familiar with Defendant's standard credit reporting methods would be misled by seeing Defendant reporting post-Bankruptcy account balances and delinquencies in respect to the Debt to believe that Plaintiff incurred new debt during the Bankruptcy or that Plaintiff reaffirmed the debt notwithstanding the discharge because Defendant's reporting deviated from Metro 2 reporting instructions.

139. However, Plaintiff did not incur new debt with Defendant during the Bankruptcy proceeding or reaffirm the Debt in the Bankruptcy.

140. Accordingly, by reporting post-Bankruptcy derogatory information, Defendant did not comply with the Metro 2 format.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

141. Even if Defendant reported accurately elsewhere in the same account tradeline that the Debt was included in the Bankruptcy, such reporting would be patently inconsistent, confuse potential creditors, and thus, be inherently inaccurate and materially misleading.

142. Furnishers utilizing the Metro 2 reporting standard correctly is crucial because the Metro 2 system creates a uniform standard for the meaning given to each field provided, which fosters consistency in how furnishers formulate data to report to the credit bureaus, which ultimately leads to objective credit evaluations.

143. Moreover, the FCRA and CCCRAA impose no requirement or mandate that a furnisher provide any information to a consumer reporting agency. Indeed, the CDIA has repeatedly noted that the act of furnishing information to a consumer reporting agency is completely voluntary.[5]

144. Accordingly, once Plaintiff filed the Bankruptcy, Defendant was required to report accurately to the consumer reporting agencies or not report Plaintiff's account at all.

145. Upon information and belief, Plaintiff alleges that Defendant did not comply with the Metro 2 reporting standards in respect to Plaintiff's account and reported inaccurately by failing to comport their reporting practices with the implication of Plaintiff's filing of the Bankruptcy and ultimate discharge.

///

///

///

---

[5] *See, e.g.,* Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information: Hearing Before the H. Comm. on Fin. Serv., 110 Congr. 50 (2007) (written statement of Stuart Pratt, President and CEO, Consumer Data Industry Association) ("not a single one of the more than 18,000 data furnishers has to provide a single record of data to our members").

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

146. Accordingly, Defendant's non-compliance with the Metro 2 reporting standards constitutes an inaccurate or misleading statement under the FCRA and CCCRAA, because a furnisher that fails to comply with the uniform and objective Metro 2 reporting standards compromises the credit reporting system.

147. Because credit reporting is a voluntary act, Defendant's deviation from the Metro 2 format instructions—the industry standard and its chosen method of reporting—constitutes an inaccurate or misleading statement, because those making credit decisions, who would expect that furnishers like Defendant would adhere to the Metro 2 format, would view delinquency notes, account balances, and/or past due statuses reporting after a bankruptcy was filed more negatively than "no data" with a bankruptcy status.

148. In other words, Defendant's failure to adhere to the Metro 2 format would prompt those making credit decisions to draw a more negative inference from Defendant's reporting.

149. Plaintiff subsequently learned that Defendant reported post-Bankruptcy derogatory credit information regarding the obligations on Plaintiff's credit reports, thereby causing erroneous and negative credit information in Plaintiff's credit files and damaging Plaintiff's creditworthiness.

150. As a direct and proximate result of result of Defendant's willful and untrue communications, Plaintiff has suffered actual damages including, but not limited to, reviewing credit reports, incurring attorney's fees, and such further expenses in an amount to be determined at trial.

151. As a further direct and proximate result of Defendant's acts stated herein, Plaintiff incurred pain and suffering, was impeded in seeking necessary products and services from vendors, suffered humiliation, embarrassment, anxiety, loss of sleep, emotional distress, and defamation of character.

## ICS INACCURATE AND MATERIALLY MISLEADING INFORMATION

## RE: ACCOUNT NO.: 4331313XXXX

152. In an Equifax Credit Report dated November 13, 2016, Defendant reported the following inaccurate, derogatory information for the above-referenced account number, as of November 2016:

- Current Status: D - Unpaid
- Balance: $319

153. There was also no notation, status update, or any other indication in the tradeline as it was reported to Equifax that the Account was discharged in Plaintiff's Bankruptcy.

154. This Account was discharged in Plaintiff's Chapter 7 Bankruptcy, which was filed on April 23, 2013 and discharged on August 12, 2013.

155. By reporting an amount past due and balance owing of $319, as opposed to the true amount owing of $0 following Plaintiff's successful Bankruptcy discharge, Defendant inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay the alleged Debt to Defendant, which is the opposite effect of Plaintiff receiving a Chapter 7 bankruptcy discharge.

156. Further, the "D - Unpaid" status reported by ICS, as opposed to the correct status of "Included in Bankruptcy", inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay the alleged Debt to Defendant, which is the opposite effect of Plaintiff receiving a Chapter 7 bankruptcy discharge.

157. Again, the derogatory, delinquent information furnished by Defendant during the pendency of the Bankruptcy and after discharge were inaccurate and materially misleading because it suggests that the accounts were still collectable during and after the bankruptcy, even though the bankruptcy discharge related back to the date Plaintiff filed for bankruptcy.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

158. Defendant's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

159. Defendant received notice of the Bankruptcy filing on or about April 23, 2013 through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center.

160. Defendant also received notice of the Bankruptcy discharge on or about August 12, 2013 through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center.

161. Despite receiving notice of the Bankruptcy, Defendant furnished derogatory post-Bankruptcy information that it knew or should have known to be inaccurate or incomplete in such a way that would be misleading and thereby adversely affect credit decisions.

162. Rather than using the bankruptcy information sent specifically to Defendant that Defendant knew or should have known existed, Defendant chose to continue reporting inaccurately on Plaintiff's credit report.

163. Rather than using the publicly available Bankruptcy information that Defendant knew or should have known existed, Defendant chose to continue reporting inaccurately on Plaintiff's credit report.

164. Defendant's credit reporting information is relevant to Plaintiff's credit score, and Defendant's inaccurate reporting is misleading and therefore adversely affects Plaintiff's creditworthiness.

165. Therefore, Defendant's inaccurate and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

166. Through this conduct, Defendant violated 15 U.S.C. § 1692e by using false, deceptive and misleading representations in connection with the collection of Plaintiff's alleged debt.  This section is incorporated into the RFDPCA by Cal. Civ. Code § 1788.17; thus, Defendant violated Cal. Civ. Code § 1788.17.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

167. Through this conduct, Defendant violated 15 U.S.C. § 1692e(2)(A) by falsely representing the character, amount, and legal status of Plaintiff's alleged debt. This section is incorporated into the RFDPCA by Cal. Civ. Code § 1788.17; thus, Defendant violated Cal. Civ. Code § 1788.17.

168. Through this conduct, Defendant violated 15 U.S.C. § 1692e(8) by communication false information to the credit bureaus regarding Plaintiff's alleged debt. This section is incorporated into the RFDPCA by Cal. Civ. Code § 1788.17; thus, Defendant violated Cal. Civ. Code § 1788.17.

169. Through this conduct, Defendant violated 15 U.S.C. § 1692e(10) by using false representations and deceptive means to collect Plaintiff's alleged debt. This section is incorporated into the RFDPCA by Cal. Civ. Code § 1788.17; thus, Defendant also violated Cal. Civ. Code § 1788.17.

170. Through this conduct, Defendant violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect Plaintiff's debt. This section is incorporated into the RFDPCA by Cal. Civ. Code § 1788.17; thus, Defendant also violated Cal. Civ. Code § 1788.17.

171. Through this conduct, Defendant violated 15 U.S.C. § 1692f(1) by collecting an amount from Plaintiff not permitted by law. This section is incorporated into the RFDPCA by Cal. Civ. Code § 1788.17; thus, Defendant also violated Cal. Civ. Code § 1788.17.

172. Through this conduct, Defendant has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, a consumer reporting agency, that Defendant knew or should have known was inaccurate.

### CLASS ACTION ALLEGATIONS

173. Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated (the "Class").

174. Plaintiff seeks to maintain this action as a class action representing a class consisting of the following:

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

All individuals who, on or after February 2012 have had a consumer report relating to them prepared by any of the credit reporting agencies in which one or more of their ICS tradeline accounts or debts was not reported as discharged despite the fact that such debts had been discharged as a result of their bankruptcy under Chapter 7 and Chapter 13 of the Bankruptcy Code.

175. This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of the Class, and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

176. <u>Ascertainability / Numerosity</u>: This class is ascertainable in that it is comprised of individuals who can be identified by reference to purely objective criteria contained in the records of Defendant and the various credit reporting agencies. Defendant and its employees or agents are excluded from the Class. Plaintiff does not know the number of members in the Class, but believes the Class members number in the hundreds of thousands, if not more. Thus, this matter should be certified as a Class action to assist in the expeditious litigation of this matter.

177. <u>Typicality</u>: The claims of the named Plaintiff are typical of the claims of each member of the Class they seek to represent because: (1) they all had debts owed to Defendant that were discharged in a Chapter 7 or 13 bankruptcy; (2) they have all been injured by Defendant's reporting of an outstanding balance and refusal to remove the notation "charged off" or "unpaid/past due/charged off" or similar notations despite the fact that the debts have been discharged in bankruptcy; and (3) each of their claims is based upon the same legal theories, i.e. that Defendant violated the FDCPA, RFDCPA, and CCCRAA.

178. <u>Adequacy of Representation:</u> Plaintiff is an adequate representative of the Class she seeks to represent because: (a) she is willing and able to represent the proposed class and has every incentive to pursue this action to a successful conclusion; (b) her interest is not in any way antagonistic to those of the other Class Members; and (c) she is represented by counsel experienced in litigating significant consumer issues, including the issues specifically raised in this action.

179. <u>Commonality:</u> There are several questions of law and fact common to all members of the Class. The primary question of law and fact that is common to all members of the class is whether Defendant, in failing and/or refusing to update and correct the credit reports of Class Members, has acted knowingly and willfully in violation of the FDCPA, RFDCPA, and CCCRAA.

180. A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendant to comply with federal and California law. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the maximum statutory damages in an individual action for the alleged violations are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

181. Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

///

///

///

///

///

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT

## 15 U.S.C. § 1692 ET SEQ.

## [AGAINST DEFENDANT]

182. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

183. The foregoing acts and omissions constitute numerous and multiple violations of the FDCPA, including but not limited to each and every one of the above cited provisions of the FDCPA, 15 U.S.C. §§ 1692 et seq.

184. As a result of each and every violation of the FDCPA, Plaintiff is entitled to any actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in the amount of up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3).

## COUNT II

## VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT

## Cal. Civ. Code §§ 1788-1788.32 (RFDCPA)

## [AGAINST DEFENDANT]

13. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

14. The foregoing acts and omissions constitute numerous and multiple violations of the RFDCPA.

15. As a result of each and every violation of the RFDCPA, Plaintiff is entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a); statutory damages for a knowing or willful violation in the amount up to $1,000.00 pursuant to Cal. Civ. Code § 1788.30(b); and reasonable attorney's fees and costs pursuant to Cal. Civ. Code § 1788.30(c) from each Defendant individually.

**COUNT III**

**VIOLATION OF CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT**

**CAL. CIV. CODE § 1785.1 ET SEQ.**

**[AGAINST DEFENDANT]**

185. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

186. The foregoing acts and omissions constitute numerous and multiple violations of the California Consumer Credit Reporting Agencies Act.

187. In the regular course of its business operations, Defendant routinely furnish information to credit reporting agencies pertaining to transactions between Defendant and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

188. Because Defendant is a partnership, corporation, association, or other entity, and is therefore each a "person" as that term is defined by Cal. Civ. Code § 1785.3(j), Defendant is and always was obligated to not furnish information on a specific transaction or experience to any consumer credit reporting agency if they knew or should have known that the information is incomplete or inaccurate, as required by Cal. Civ. Code § 1785.25(a).  Defendant knew or should have known that Plaintiff's debt was discharged.  Thus, Defendant violated Cal. Civ. Code § 1785.25(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and The Class Members pray for judgment as follows:

- Certifying the Class as requested herein;
- Providing such further relief as may be just and proper;
- An award of actual damages, in an amount to be determined at trial, pursuant to 15 U.S.C. § 1692k(a)(1);
- An award of actual damages, in an amount to be determined at trial, pursuant to Cal. Civ. Code § 1788.30(a);

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

- An award of actual damages, in an amount to be determined at trial, pursuant to Cal. Civ. Code § 1785.31(a)(2)(A);

- An award of statutory damages of $1,000.00, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

- An award of statutory damages of $1,000.00, pursuant to Cal. Civ. Code § 1788.30(b);

- An award of costs of litigation and reasonable attorney's fees, pursuant to Cal. Civ. Code § 1788.30(c);

- An award of attorneys' fees and costs pursuant to Cal. Civ. Code § 1785.31(a)(1); and, Cal. Civ. Code § 1785.31(d);

- An award of punitive damages pursuant to Cal. Civ. Code § 1785.31(a)(2)(A);

- An award of costs of litigation and reasonable attorney's fees, pursuant to 15 U.S.C. § 1692k(a)(3); and

- For equitable and injunctive relief pursuant to Cal. Civ. Code § 1785.31(b);

- That the Court preliminarily and permanently enjoin Defendant from engaging in the unlawful debt collection and credit reporting practices stated herein;

- Any and all other relief the Court deems just and proper.

Dated: March 30, 2017                                    Respectfully submitted,

                                              KAZEROUNI LAW GROUP, APC

                                              By:   /s/ Matthew M. Loker
                                              MATTHEW M. LOKER, ESQ.
                                              ATTORNEY FOR PLAINTIFF

**TRIAL BY JURY**

189. Pursuant to FED. R. CIV. P. 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 30, 2017                                 Respectfully submitted,

                                        **KAZEROUNI LAW GROUP, APC**

                                By:  ___/s/ Matthew M. Loker___
                                     MATTHEW M. LOKER, ESQ.
                                     ATTORNEY FOR PLAINTIFF

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626